JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6511 | **DATE** | 7/27/2004 |
| **CASE TITLE** | Cherie Rosenthal vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated in the attached memorandum opinion, the plaintiff's motion for summary judgment is denied. The defendant's motion for summary judgment is granted and the judgment of the Administrative Law Judge is hereby affirmed. All pending dates and motions are hereby stricken as moot. Terminating case. Enter Memorandum Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JUL 2 8 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 10 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MW | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 2004 JUL 27 PM 3: 46 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHERIE ROSENTHAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 6511 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION., | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
JUL 2 8 2004

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Cherie Rosenthal's ("Rosenthal")
and Defendant Jo Anne B. Barnhart's ("SSA") cross-motions for summary judgment.
For the reasons below, we grant SSA's motion for summary judgment and deny
Rosenthal's motion for summary judgment. The judgment of the Administrative
Law Judge ("ALJ") is hereby affirmed.

## BACKGROUND

On July 30, 1999, Plaintiff Rosenthal applied for Disability Insurance Benefits
("DIB") under the Social Security Act. Rosenthal's Date Last Insured ("DLI") was



December 31, 1983. Therefore, in order to be entitled to DIB, she had to prove that she was disabled on or before that date. SSA denied Rosenthal's claim for DIB and denied Rosenthal's request for reconsideration. Rosenthal then requested a hearing.

On November 8, 2000, Rosenthal appeared at a hearing before an ALJ. At the time of the hearing, which took place twenty-seven years after her DLI, Rosenthal was forty-six years old. On June 13, 2001, the ALJ denied Rosenthal's application for DIB, finding she did not have a severe impairment. On July 16, 2003, the Appeals Council denied Rosenthal's request for review, making the ALJ's decision the final decision of the Commissioner.

At the hearing before the ALJ Rosenthal testified that she experienced symptoms such as fatigue, muscle aches, and joint pains since she was nine years old. The record shows that she missed many days of school starting in junior high and high school. Rosenthal, who has a high school education, performed clerical, secretarial, and receptionist work in the 1970's but stopped working in 1978. She testified that at this point, she suffered from pain, stiffness, fatigue, respiratory problems, light-headedness, problems concentrating, depression, anxiety, sensitivity to chemicals and light, and used anti-inflammatories, a heat pack, a neck brace, a shoulder sling, and an elastic bandage for relief. She also testified that, in 1978, she was able to cook, shop, or clean on a good day, but she would require a couple days to recover. She further testified that her symptoms improved with meditation, exercise, and stretching.

Rosenthal has entered several documents into the record in an attempt to prove her disability existed prior to her DLI in 1984. She has submitted an attending physician's statement dated 1982, signed by Ms. Rosenthal's doctor, which diagnose her with pleurisy and rheumatoid arthritis. The rheumatoid arthritis diagnosis was later found to be incorrect. She has also submitted receipts for blood tests performed in the 1970's, but the results of these tests are not available. There is also no explicit diagnosis of fibromyalgia, the condition which, according to Rosenthal, is mainly responsible for her disability.

Rosenthal submitted a treatment report dated 1984 that documents her reported diagnosis of rheumatoid arthritis and pneumonia. In her report, she also complains of thirst, headaches, fatigue, and irritability.

There are no further medical records available until 1990, almost seven years after Rosenthal's DLI, when she was treated by Patrick T. Schuette, M.D. In the subjective portion of his report, Schuette noted Rosenthal's history of generalized myalgia and easy fatiguability, stating the two had been present for more than ten years. Dr. Schuette documented Rosenthal's claims that her symptoms were variable and generally associated with stiffness. He also noted that Rosenthal exercised quite often and "in fact is quite strong." Dr. Schuette further declared that Rosenthal is "a well developed, well nourished woman in no acute distress", and her tests came out generally normal. Finally, under the "impressions" part of his report, Schuette opined that Rosenthal likely has fibrositis, that there is no evidence of rheumatoid

arthritis, and that a mild form of lupus, although possible, was unlikely.

In November 1995, Rosenthal first noticed a tumor in her right breast. In 1998, she was treated for advanced breast cancer. Rosenthal's cancer has no bearing on this case, since it occurred after the DLI. However, any records that may describe her condition before the DLI are worth noting. At this time (1998), her fibromyalgia was described as "being of a complicated nature, but relatively controlled." Her asthma was noted, but her lungs were also clear and her extremities were normal with no signs of deformity or arthritis. Her neurological exam was also normal.

On August 4, 1999, a state agency physician stated that there was insufficient objective medical evidence in Rosenthal's file to fashion an RFC. However in September 1999, a different state agency physician reviewed Rosenthal's medical records and found she had the residual functional capacity (RFC) to perform light work. However, he based his limitations on her treatment for cancer.

On September 4, 1999, Dr. Schuette wrote a letter stating that Rosenthal had "long-standing" fibromyalgia with chronic diffuse pain and weakness, as well as chronic fatigue syndrome. He stated these problems have been present "for several years", that they have remained stable, and that they "continue to interfere with her functional capacity because of the pain." In this letter he also stated that after testing, Rosenthal was shown to have evidence of the Epstein-Barr capsid antigen, but the Epstein-Barr antibody and EBNA antibody tests came up negative.

4

Dr. G.R. Oberg began to treat Rosenthal in the 90's for her allergy symptoms. In 1999, he noted that she was experiencing adrenal exhaustion as a result of her cancer and treatment. She was advised to self-administer shots as needed and take Cortisol. Rosenthal reported improvement in her symptoms with this treatment. In February, 2000, tests still showed adrenal exhaustion, and Dr. Oberg speculated that her adrenals may have been permanently damaged as a result of her cancer therapy. He also stated "beyond a reasonable degree of medical certainty" that she had serious and potentially disabling health problems for many years. On December 3, 2000, Dr. Oberg wrote a letter in reply to Rosenthal's inquiries about her condition. He explained to her that he ordered adrenal tests because her "history clearly indicated a many decade history of serious multi-system inflammatory and allergic conditions that can result eventually in chronic exhaustion of the ability of your adrenals." On December 6, 1999, Rosenthal's husband wrote a letter which stated that she experienced random pain in her joints and muscles, fatigue, insomnia, and disorientation. He also stated she could not consistently do housework. In November, 2000, Dr. Schuette wrote Rosenthal a letter informing her of recent tests indicating that she had only modest tendonitis of the ankle. He also stated that tests showed her red blood cell count was low but that he did not believe there was any significant connotation to that. Schuette noted that her symptoms were consistent with fibromyalgia. On December 1, 2000, Dr. Schuette wrote another letter to Rosenthal in which he stated she had clear diagnosis of fibromyalgia. He noted that

5

she had tenderness in the multiple trigger points used to diagnose fibromyalgia. He again noted that there was no evidence of active arthritis and her conditions were normal for one inflicted with fibromyalgia.

In his decision denying Rosenthal's claim for DIB, the ALJ considered all the evidence and applied the five-step analysis. At step one, the ALJ found that Rosenthal was not presently employed. The ALJ found that she failed at step two, which is whether the claimant has an impairment that can be classified as "severe".

The ALJ gave several reasons why Rosenthal lacked the evidence to establish that she had a severe impairment before her DLI. He stated that she had presented no evidence of a medically determinable impairment prior to her DLI, noting that her fibromyalgia was not confirmed until December 1, 2000. The ALJ also noted the state physician's statement that Rosenthal's file lacked the objective medical evidence to create an RFC. The ALJ interpreted this statement to mean there is insufficient data to establish the existence of a medically determinable impairment. The ALJ then proceeded to discuss each of Rosenthal's pieces of evidence, noting several instances of conflicting evidence. For instance, he discussed Schuette's diagnosis of fatiguability in 1990 but then noted the fact she exercised often and felt strong at that time. He also noted Dr. Schuette's statement that she was well-nourished and developed.

The ALJ admitted that Rosenthal now has fibromyalgia. However, he does not find any evidence that shows she suffered from it before the DLI. The only pre-

DLI document he mentions is the health claim form which indicates rheumatoid arthritis, pneumonia and possible pleurisy, but then discounts the arthritis claim because Schuette found no evidence of arthritis in his tests.

The ALJ held that because there are no clinical signs or laboratory findings as evidence of Rosenthal's impairment before her DLI, there was no objective medical basis on which to base her claims, and denied her DIB. In his denial, he also noted that judging by the two times he saw her, she did not appear to be uncomfortable. Since her condition was "unquestionably" worse than before, the ALJ inferred that her condition at the time of her claim did not qualify as a severe impairment. Rosenthal now seeks judicial review of the ALJ's decision.

## LEGAL STANDARD

A reviewing court will uphold an ALJ's decision if it is supported by "substantial evidence" in the record and the ALJ applied the correct legal standards. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). When determining if substantial evidence exists, the court must review the record as a whole but is not allowed to substitute its judgment for the ALJ's by "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). Deference

should be given to an ALJ's determinations relating to credibility and should be reversed only if the determinations are "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)). By contrast, the ALJ's legal conclusions are reviewed de novo. *Aidinovski v. Apfel*, 27 F.Supp.2d 1097, 1101 (N.D. Ill. 1998). However, an ALJ must provide some explanation that would allow the parties to understand his reasoning for his decision. *See Clifford*, 227 F.3d at 872 (stating that an ALJ "must build an accurate and logical bridge from the evidence to his conclusion."). Further, in reviewing the decision, the court must confine its review to the explanation and reasoning given by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

## DISCUSSION

The SSA employs a five-step process to evaluate applicants for federal disability benefits. First, if an applicant is engaged in substantial gainful employment, that applicant does not qualify for disability insurance. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Second, if the applicant does not have a sufficiently severe physical or mental impairment, the SSA will deny disability insurance. *Id.* Third, if the applicant's impairment or combination of impairments satisfies or is medically equivalent to one of a series of enumerated disability "listings," the SSA will find that the applicant is disabled. *Id.* Fourth, the SSA calculates the applicant's "residual functional capacity" ("RFC") with the impairment, and if the

SSA finds that the applicant can still perform the same relevant work after the impairment as before, the SSA will deny benefits. *Id.* Finally, using the same RFC along with the applicant's age, education and work experience, the SSA determines whether the applicant can adjust to other work, in which case the SSA will deny disability insurance. *Id.*

This process is structured so that if an applicant satisfies steps one through three, the inquiry ends and the SSA finds the applicant disabled. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). However, if the applicant satisfies the first two steps but does not satisfy the third, the inquiry proceeds to the fourth and, possibly, fifth steps. *Id.* Denham claims that the ALJ in her case erred at three points in his analysis. First, she suggests that he failed to evaluate the credibility of her testimony accurately in light of the medical evidence presented. Second, she argues that the ALJ did not adequately consider whether her combined impairments were medically equivalent to a disability listing at step three. Finally, Denham also contends that the ALJ failed to consider all of the necessary medical and vocational evidence in calculating and applying her RFC at step four.

Rosenthal contends that the dismissal of her case at step two of the disability determination 1) was not supported by substantial evidence, and 2) constituted a legal error. Since the issues overlap in many respects, they will be discussed concurrently.

## I. Whether a Medically Determined Impairment Existed Prior to her DLI

Rosenthal first contends that denying her claim at step two was erroneous because the threshold for finding severity is low. She also argues that an impairment does not have to be disabling in order to be severe. The claimant has the burden of proof at step two. *See Young v. Secretary of Health and Human Servs*, 957 F.2d 386, 389 (7th Cir. 1992)(stating that "[t]he claimant bears the burden of proof in steps one through four . . .[and that] [i]f that burden is met, the burden shifts to the Secretary to prove that the claimant cannot perform other work in the economy."); *Meroki v. Halter*, 2001 WL 668951, at *4 (N.D. Ill. 2001); 20 C.F.R. § 404.1520. *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000)(quoting SSR 96-3p and stating that the "rules intended to offer guidance to agency adjudicators . . . [and [w]hile they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs 'binding on all components of the Social Security Administration.' "). *See* SSR 96-3p, 1983 WL 31249 at *1. The Seventh Circuit has stated that a finding of "severity" is merely a threshold determination. *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

Rosenthal argues that the overall record shows that she suffered from a severe impairment before 1983. To support her conclusion, she directs the court to evidence submitted in the record. This evidence can be categorized in two ways: records dated before her DLI in 1983, and records post-dating her DLI that

potentially relate back to her condition before her DLI.

Any medical records pre-dating Rosenthal's DLI might pass the severity threshold if they clearly indicated she suffered from an impairment at the time they were dated. However, she offers few pieces of evidence that specifically indicate that she suffered from an impairment prior ro the DLI. Rosenthal admits in her reply brief that she only has two pieces of evidence that relate to medical care that occurred prior to her DLI. (Reply 1). She states that in the record there are blood tests performed in the 1970s. However, she also admits that the results of the tests are not in the record and thus the tests do not indicate that she suffered from an impairment at that time. Rosenthal also claims that in the record is her physician's diagnosis of rheumatoid arthritis and pleurisy prior to her DLI. However, it was subsequently proven that Rosenthal never suffered from rheumatoid arthritis and Rosenthal does not claim pleurisy was a major contributing factor to her alleged impairment. Rather, she speculates that her symptoms which led to the diagnosis of rheumatoid arthritis were, in fact, fibromyalgia. Since Rosenthal's contentions are speculative, it is quite reasonable that the ALJ did not give much weight to these pieces of evidence and stated "[p]rior to December 1, 1983, there are no clinical signs or laboratory findings in the record to establish the existence of a medically determinable impairment." (Rec 25). *See also Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998)(stating that "[i]t is not enough to show that [the claimant] had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured

period, since fibromyalgia is not always (indeed, not usually) disabling.").

The evidence entered by Rosenthal that post-dates her DLI is also ambiguous as to whether she suffered from a severe impairment during the time in question. She relies on generalized statements made by her treating doctors to prove the existence of her impairment prior to her DLI. In 1990, Dr. Schuette noted that Rosenthal's testimony of generalized myalgia and easy fatiguability had been present for more than ten years. However, the ALJ found it significant that Dr. Schuette's observed her symptoms were variable and found an absence of any muscle weakness or atrophy. He also found significant Rosenthal's admission that she exercised often and felt strong at this point in time. The ALJ further noted that blood tests came out normal. Therefore, he reasonably concluded that even if Schuette had found signs of fibrositis (which was later renamed fibromyalgia) in 1990, her symptoms did not indicate any severe condition at that time, let alone seven years prior. The ALJ also found it significant that Schuette was merely giving an impression and had not actually performed the tests used to diagnose fibromyalgia.

Schuette's September 4, 1999 letter is equally ambiguous as to the intensity or onset of Rosenthal's afflictions. His description of her "long-standing" fibromyalgia that was present for "several years" does not clearly indicate whether he believed it began prior to 1983. Another statement on which Rosenthal attempts to rely was made on December 3, 2000, by Dr. Oberg, who treated her for allergies. He stated that Rosenthal had a "many decade history of serious multi-system inflammatory and

allergic conditions" that could eventually result in the exhaustion of her adrenal glands. Although this statement possibly applies to the period before her DLI, it too fails to make any kind of statement as to the intensity of her symptoms.

What is especially damaging to Rosenthal's reliance on the physicians' statements in the previous paragraphs is the fact those same doctors all refused to issue a statement regarding her capacities prior to 1984. Rosenthal's attorney admitted that they attempted to elicit retroactive opinions to all of her treating physicians, but they "didn't feel comfortable making that type of assessment." These refusals by the physician to make an affirmative statement can be viewed negatively by the ALJ. *Scott v. Sullivan*, 898 F.2d 519, 523 (7th Cir.1990). These refusals strongly indicate that although there are some signs of medical abnormality, the doctors did not firmly believe that she suffered from anything that significantly limited her ability to perform basic work activities for at least a consecutive twelve month period prior to her DLI. *See* SSR 96-3p, 1983 WL 31249 at *1. Clearly, the ALJ reasonably concluded from the doctors' statements that there is no medically determined impairment on record stating Rosenthal was severely impaired before 1984.

## II. Testimony of Rosenthal and Husband and Nature of Fibromyalgia

Rosenthal also argues that the failure of the ALJ to address the testimony of her and her husband regarding her health before her DLI, especially in light of the

nature of fibromyalgia, constituted a legal error warranting remand. She contends that due to the nature of fibromyalgia, the testimony of the claimant should be given even more weight, since it is mainly a subjective diagnosis. She also notes that fibromyalgia was not well-understood at the time of her DLI, and alleges that the ALJ did not take this into account when making his decision in determining the existence of a severe impairment. Rosenthal states in her brief that the ALJ made a decision as if there has always been "objectively documented indications of the disease, even though a diagnosis of fibromyalgia is based on subjective symptoms...though, at the time of the DLI, the disease was not well understood." In other words, Rosenthal contends that both the ALJ's failure to give weight to her and her husband's testimony and his failure to consider the nature of fibromyalgia are reasons why she is entitled to summary judgment.

We first address the ALJ's failure to give her testimony weight. Although a claimant's allegations of her symptoms cannot be completely disregarded, her symptoms alone, no matter how genuine they appear to be, are not enough to establish a medically determinable physical or mental impairment; they must be supported by medical signs and laboratory findings. SSR 96-4p, 1996 WL 374187. In the absence of a medically determinable impairment, the individual must be found not disabled at step two of the sequential evaluation process. *Id.*

The determination of the impairment responsible for claimant's alleged symptoms does not have to have occurred at the time of the DLI. *Wilder v. Apfel,*

153 F.3d 799, 802 (7th Cir. 1998). If a subsequent medical diagnosis is made indicating the condition existed at the time of the DLI, and the retrospective diagnosis is corroborated by evidence contemporaneous with the period in question, then the requirement of showing the existence of a medical impairment is satisfied. *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998).

There is no evidence that the ALJ was looking for a medically determinable impairment only at the time of the DLI, as Rosenthal contends. The ALJ does state that there are no signs prior to 1983 of a medically determinable impairment, but he also considers all of Rosenthal's subsequent alleged impairments, stating "[i]t is emphasized that all of the claimant's alleged impairments have been taken into account in reaching this decision."

Once a medical impairment that could be reasonably expected to produce the symptoms alleged by the claimant has been established on the basis of medical signs and tests, the allegations of those symptoms must be considered with all other evidence in the case record. SSR 96-4p, 1996 WL 374187.

In this case, Rosenthal has failed to prove the existence of an impairment through medical signs and testing in order to enable the ALJ to give weight to her and her husband's testimony. First, Rosenthal's treating doctors' explicit refusal to make any retroactive diagnoses has already been discussed. This refusal of her doctors to make such a diagnosis is what distinguishes this case from *Estok*, and makes Rosenthal's reliance on that case misplaced. In *Estok*, there was an

affirmative statement by the treating doctor that claimant's fibromyalgia began before her DLI. 152 F.3d at 638-39. In the current case, there is no such statement that Rosenthal's fibromyalgia started before her DLI.

Second, the record does not support Rosenthal's testimony with medical signs or laboratory results. Medical signs are "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements [of symptoms]. 20 C.F.R. § 404.1528. Signs must be shown by "medically acceptable clinical diagnostic techniques." *Id.* The ambiguity and conflicting evidence of any signs of an impairment pre-dating Rosenthal's DLI has also previously been discussed, and to reiterate, there was no evidence indicative of a severe impairment during that time.

There are also no laboratory findings to support Rosenthal's claim. Laboratory findings are "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques". 20 C.F.R. § 404.1528. The only tests conducted prior to her DLI were the blood tests, the results of which are not available. The fact that she had blood test taken cannot be said to be indicative of anything. The ALJ in his opinion methodically noted the results of each of Rosenthal's tests given subsequent to her DLI. Although some of these tests show some abnormalities, none of them even strongly suggest a medically determinable impairment that began prior to her DLI.

Since there was no medically proven impairment before the DLI, the ALJ reasonably did not give significant weight to Rosenthal's and her husband's

testimony and properly ordered Rosenthal to have failed step two of the sequential evaluation process.

The record shows that the ALJ did consider the nature of fibromyalgia in coming to his decision. An administrative law judge does not have to provide a complete written evaluation of every piece of testimony and evidence. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The ALJ mentions the trigger points used to diagnose fibromyalgia in his decision. Contrary to Rosenthal's assertion, this inclusion is significant as it shows he was aware of the nature of the disease and considered it when he issued his decision. The ALJ also mentioned that the clinical signs of fibromyalgia were not found in Rosenthal until December 1, 2000. He also reasonably considered that the evidence that some other symptoms of fibromyalgia, such as a reduced range of motion, were not found in earlier examinations by Dr. Schuette. Further, despite the nature of fibromyalgia, plaintiff still bears the burden of showing she had a medically determinable impairment. *See Estok*, 152 F.3d at 638. (stating that "[a]lthough fibromyalgia is difficult to diagnose . . . and although Estok faced a labyrinthine search for a proper diagnosis and appropriate treatment, we are limited by our standard of review and the legal definition of 'disability' under the Social Security Act."). Since the ALJ reasonably concluded Rosenthal did not meet this burden, substantial evidence still supports the ALJ's decision that there has been no medically determinable impairment prior to 1983.

III. Duty to Develop the Record or Determine Onset of Disability

Rosenthal also contends the ALJ is also obligated to develop the record and determine the onset date of disability, and that in failing to seek additional medical input in the issue of when Rosenthal's fibromyalgia began, he mistakenly replaced an expert's judgment with his own. She cites for support SSR 83-20, which states that for disabilities of nontraumatic origin, there are other considerations that must be taken into account such as work history and medical and other evidence concerning impairment severity.

Rosenthal's argument in regards to this issue is not on point. SSR 83-20 only applies in cases where the ALJ has determined the existence of a disability prior to a DLI and there is a question as to whether the disability began at an earlier time. *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). Since the ALJ determined that there was no disability prior to her DLI, the provisions of SSR 83-20 does not apply here. An ALJ is required "to develop a full and fair record." *Howell v. Sullivan*, 950 F.2d 343, 348-49 (7th Cir. 1991). There was no reliable evidence of any type of disability prior to the DLI and no need for further investigation. The ALJ not required to engage in extensive investigations in a matter because of the absence of any competent evidence in the claimant's favor. *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997)(finding that ALJ did not fail to fully develop the record and finding that plaintiff had not shown prejudice and that "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is

insufficient to warrant a remand."). We have reviewed the record in this action and we do not find that the ALJ failed to further develop the record in regards to any of the presented issues.

## IV. Weight Given to Opinion of Treating Physician

Rosenthal next contends that the ALJ failed to give Dr. Schuette significant, if not controlling weight. She asserts that his impression of fibrositis in 1990 as well as his subjective observation of her general symptoms that had been present for more than ten years should be accepted as proof of her impairment. The opinion of a treating physician "regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)(citing 20 C.F.R. § 404.1527(d)(2))(stating that "[m]ore weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances."). However, the Seventh Circuit has warned courts to "keep in mind the biases that a treating physician may bring to the disability evaluation . . . [because] [t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). A consulting physician may have relevance even though the physician did not examine the claimant because the "claimant's regular physician

may not appreciate how her patient's case compares to other similar cases [whereas] a consulting physician's opinion might have the advantages of both impartiality and expertise." *Id.*

In this case, the ALJ's decision not to give controlling weight to Dr. Schuette's opinion was well-supported. First, neither the nature or severity of the impairment is well-supported by clinical or laboratory diagnostic techniques, as discussed above. Second, Dr. Schuette had not begun to treat Rosenthal until seven years after her DLI, and his finding of her generalized myalgia and easy fatiguability being present for ten years is based on her own complaints, and is in the "subjective" portion of his analysis. The ALJ is authorized to make his own credibility determination on medical assessments based on subjective statements. *Diaz*, 55 F.3d at 307. The ALJ noted that Dr. Schuette gave an "impression" of fibrositis, which was not yet confirmed through testing. Dr. Schuette's report does not even seem to suggest that the fibrositis was present for ten years like his subjective findings of generalized myalgia and fatigue. The ALJ also observed that at this point in time, Rosenthal was essentially clinically normal. Once again, Dr. Schuette's refusal to make a statement regarding her capacities in 1983 is also significant here. All of the previous evidence supports the ALJ's decision not to give much weight to Dr. Schuette's impression. While Rosenthal argues that the ALJ made a speculative decision, the evidence suggests that a greater level of speculation would be required to make a finding that a severe impairment did exist prior to her DLI.

Further, the ALJ's denial of Rosenthal's claim is not necessarily indicative that he gave the agency doctor's opinion greater weight, as Rosenthal alleges. There is no indication that the ALJ did so. The opinion of the state physician is only mentioned in a small paragraph in the ALJ's decision. The ALJ's decision is substantially supported by the evidence and the impression of the agency doctor is merely a part of that support. The ALJ stated in his opinion that he took into account "all of the factors discussed above," which include all of Rosenthal's evidence, and came to the logical conclusion there was insufficient evidence to show that her impairments were severe at the time of her DLI.

## V. Articulation of Grounds for Decision

Rosenthal argues that the ALJ did not provide sufficient reasoning and thus provide a nexus between the evidence and his conclusions. If an ALJ does not articulate the grounds for his decision in a manner sufficient enough to permit judicial review, and he does not "build an accurate logical bridge between the evidence and the result", then a remand is warranted. *Clifford,* 227 F.3d at 871-72. Rosenthal does not cite any specific instances to which she is referring.

As discussed in the preceding paragraphs, it is clear that the ALJ considered all the available evidence and came to a logical conclusion. In his opinion, the ALJ mentions all relevant evidence, including findings that do not support his decision. While there are issues that may have been logically decided either way, the ALJ's

decision is given deference as long as it is supported by substantial evidence. The
evidence showed that there was no medically determinable impairment before
Rosenthal's DLI and his analysis is legally sound and supported by substantial
evidence.

### CONCLUSION

Based on the foregoing analysis, we grant Defendant SSA's motion for
summary judgment in its entirety and affirm the judgment of the ALJ. We deny
Plaintiff Rosenthal's motion for summary judgment.


Samuel Der-Yeghiayan
United States District Court Judge


Dated: July 27, 2004